## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| 1. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | Case No. 25-cv-00687-MTS |
| Plaintiff, | ) ) | **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY** |
| v. | ) ) | **PENALTIES, RESTITUTION, DISGORGEMENT, AND OTHER** |
| 2. TRAVIS FORD | ) ) | **EQUITABLE RELIEF** |
| and | ) ) | JURY TRIAL DEMANDED |
| 3. WOLF CAPITAL CRYPTO TRADING LLC, | ) ) ) | |
| Defendants. | ) ) | |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and

through its undersigned attorneys, alleges as follows:

### I.    SUMMARY

1.    From approximately October 6, 2022, to at least December 10, 2024 (the

"Relevant Period"), Defendants Travis Ford ("Ford") and Wolf Capital Crypto Trading LLC

("Wolf Capital")[1] (collectively, "Defendants") engaged in a fraudulent scheme by soliciting

individuals to participate in a commodity pool ("pool participants") in the name of Wolf Capital

(the "Wolf Capital Pool").  Defendants promised that Wolf Capital would pay these pool

participants daily returns of one percent to three-and-a-half percent, depending on the time

period, on funds deposited by pool participants.  To generate the promised returns, Defendants

stated they would take a portion of the deposited funds and Ford would use them to trade digital

---

[1] Ford operated Wolf Capital Crypto Trading as a sole proprietorship from at least October 6, 2022 until April 12, 2023.  On April 12, 2023, Ford organized the entity as an Oklahoma LLC and renamed it Wolf Capital Crypto Trading LLC.  In this Complaint, the term "Wolf Capital" refers to both the sole proprietorship and the LLC.

asset commodities, including bitcoin and ether, and futures, including futures on bitcoin, both via manual trading and by using various automated trading "bots."  To encourage more deposits, Defendants created a referral system where individuals could recruit others to join their "Wolf Packs," thereby qualifying for higher daily returns depending on the size of their Wolf Pack.  In total, participants in the Wolf Capital Pool deposited at least $10,146,714 into the Wolf Capital Pool.

2.      Defendants represented that Ford had experience trading commodities that would enable him to trade these products successfully.  Defendants also promised that Ford's trading would be fully transparent for Wolf Capital pool participants, stating that they would post all trades made with the deposited funds on Wolf Capital Telegram and Discord channels.

3.      Although Defendants did in fact transfer a portion of the funds to trading accounts at various digital asset trading platforms, and Ford manually traded spot digital assets like bitcoin and ether as well as futures such as futures on bitcoin, Defendants misrepresented Ford's true trading performance to Wolf Capital pool participants.  Defendants incurred significant losses trading these digital asset commodities and futures.  In weekly realized profit trading summaries, Defendants sometimes included small losses for certain categories of trading bots, but always posted aggregate profits.  Defendants also posted "portfolio values" that misrepresented the value of the assets purportedly managed by Wolf Capital.  Consequently, Defendants misled pool participants about Wolf Capital's actual financial condition.

4.      Eventually, Defendants incurred trading losses that made it impossible to pay the promised daily returns.  Defendants attempted to prolong the fraud by unilaterally reducing the promised maximum daily returns, but ultimately Wolf Capital collapsed.

5.      In communications to Wolf Capital pool participants, Defendants admitted that Wolf Capital sustained trading losses and that Defendants paid over $2 million in returns that were not from trading revenue but were instead from the deposits of others, in the manner of a Ponzi scheme.  Defendants ceased attempting to generate trading revenue to pay returns on funds deposited into the Wolf Capital Pool smart contract, and the vast majority of pool participants who deposited funds with Wolf Capital have not received back even their initial deposits, and certainly not the daily returns promised to them by Defendants.

6.      Despite this conduct, Defendants continued to encourage individuals to leave their stake in the Wolf Capital smart contract, with the promise of recovering the money lost through future trading and other business ventures.

7.      By engaging in this conduct and the conduct further described herein, Defendants have violated certain anti-fraud and registration provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26, namely, Sections 4b(a)(2)(A)-(C), 4k(2), 4m(1), 4$o$(1)(A)-(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6$o$(1)(A)-(B), 9(1), and CFTC Regulation ("Regulation") 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2025).

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint or in similar acts and practices.

9.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, a trading and registration ban, restitution, disgorgement, rescission, and pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

11.    Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District, among other places.

## III.    THE PARTIES

12.    Plaintiff **Commodity Futures Trading Commission** ("CFTC") is an independent federal regulatory agency that administers and enforces the Act, 7 U.S.C. §§ 1-26, and the CFTC's Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2025).

13.    Defendant **Travis Ford** is a resident of Glenpool, Oklahoma.  During the Relevant Period, Ford was a founder and the face of Wolf Capital on social media and YouTube postings.  Ford could execute transactions on the smart contract in which participants deposited funds with Wolf Capital, and Ford opened and had exclusive custody and control over trading accounts that were funded by these participants.  Ford has never been registered with the Commission in any capacity.

14.    Defendant **Wolf Capital Crypto Trading LLC** is a limited liability company organized under the laws of Oklahoma on April 12, 2023.  Wolf Capital was the name under

which Ford solicited pool participants to deposit funds into the Wolf Capital Pool. Wolf Capital is currently listed as "Inactive" on the Oklahoma Secretary of State website. Wolf Capital has never been registered with the Commission in any capacity.

## IV.    FACTS

### A.    Wolf Capital Was the Commodity Pool Operator for the Wolf Capital Pool.

15.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Digital assets include virtual currencies that are digital representations of value that function as mediums of exchange, units of account, and/or stores of value. Certain digital assets, including bitcoin and ether, are "commodities," as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

16.     Decentralized Finance, or "DeFi," uses blockchain technology to manage financial transactions in digital assets. DeFi is an alternative to traditional financial services such as those offered by banks. DeFi applications typically involve a "smart contract," which is computer code deployed on a blockchain to automatically execute pre-programmed actions when predetermined instructions are given or conditions are met. These instructions and conditions are "coded" into the smart contract by individuals often referred to as "developers."

17.     Defendants created and managed the Wolf Capital Pool to attract individuals interested in the trading and investment opportunities available through DeFi. Wolf Capital was the commodity pool operator of the Wolf Capital Pool, and Ford was an Associated Person of Wolf Capital. Defendants used a smart contract to receive funds from pool participants.

18.     Defendants worked with a developer to code and deploy a smart contract for the Wolf Capital Pool on the Ethereum blockchain. Participants contributed to the Wolf Capital Pool by "staking," or depositing digital assets into this smart contract, initially Binance USD ("BUSD") and eventually and USD Coin ("USDC"), which are both stablecoins pegged to the

United States dollar and designed to maintain price equivalence to the United States dollar. Pool participants deposited BUSD into the first version of the smart contract (with an address on the Ethereum blockchain ending in C1e3) between approximately October 6, 2022 through November 19, 2022; USDC into the second version of the smart contract (with an address ending in 97f4) between approximately February 6, 2023 and April 14, 2023; and USDC into the third version of the smart contract (with an address ending in 9958) from approximately April 15, 2023 onward.

19.    Ford launched the original version of the Wolf Capital Pool smart contract on October 6, 2022, while he ran Wolf Capital as a sole proprietorship, not a separate legal entity. Ford received approximately $728,881 BUSD in pool participant deposits into the first version of the smart contract. Ford launched the second version of the smart contract on February 6, 2023, which received approximately $1,567,978 in USDC from pool participants. On April 15, 2023, Ford created a third version of the smart contract, which ultimately received the vast majority of USDC contributed by pool participants—at least approximately $7,849,855 in USDC. In total, pool participants deposited at least $10,146,714 in BUSD and USDC from at least 3,376 unique digital wallets into the three versions of the Wolf Capital Pool smart contract.

20.    Defendants promoted the Wolf Capital Pool by promising pool participants a guaranteed daily "yield," i.e. return, based on the amounts they deposited, or "staked," to the smart contract. For example, in approximately October 2022, Defendants told pool participants they could earn 3.5% daily return (i.e., annual returns of 1,277.5%) on their deposited BUSD. Later, for example in approximately February 2023, Defendants promised pool participants they would earn a minimum one percent daily return on their deposited USDC (i.e., annual returns of 365 percent). Defendants made these promises through online solicitations including Telegram,

6

Discord, and various YouTube channels, either a Wolf Capital channel, or other channels where Ford participated in "Ask Me Anything" interviews with those channels' hosts on behalf of Wolf Capital.

21.     Although Defendants used the term "staking" to describe a deposit into the Wolf Capital smart contract, this was not a "proof-of-stake" validation method to confirm transactions and add new blocks to a blockchain for a specified cryptocurrency like Ethereum. Defendants' use of the term "staking" was instead synonymous with the words "deposit" or "investment."

22.     To attract additional pool participants in the Wolf Capital Pool, Defendants offered pool participants the opportunity to earn higher returns on their deposited USDC above the minimum one percent daily, up to at least two percent daily (or 730 percent annually), by recruiting other pool participants to form a "Wolf Pack." The number of members in a Wolf Pack determined the amount of returns over the minimum one percent that each pool participant in that Wolf Pack could earn.

23.     Defendants represented that they would generate the revenue needed to pay pool participants the guaranteed returns by using a portion of the total amount of BUSD or USDC staked to the smart contract for Ford to trade cryptocurrency, including spot and futures contracts, both manually and via trading robots, or "bots." Pool participants deposited BUSD and USDC into the Wolf Capital Pool smart contract understanding that Ford would trade, in an agency-like capacity, among other things, digital asset commodities, such as bitcoin and ether, and/or commodity interests, including futures such as futures on bitcoin, that would benefit the pool participants by generating revenue to pay the returns promised by Defendants.

24.     After a pool participant deposited BUSD or USDC into the Wolf Capital Pool smart contract, the smart contract would "auto-execute" a transfer of ten percent of that amount

to four separate wallets: one belonging to Ford and one belonging to the developer, as payment for their work in Wolf Capital; one for marketing expenses; and one that would fund contests, giveaways, etc. for the Wolf Capital pool participants.

25.     Defendants then decided how much of pool participant deposits remaining in the smart contract they would send to exchanges in order to trade various digital assets, including bitcoin and ether, as well as futures, including futures on bitcoin. Defendants transferred amounts deposited by pool participants to at least four separate digital asset exchanges. None of these exchanges were Designated Contract Markets, or "DCMs"—which operate under the regulatory oversight of the CFTC—as described in Section 5 of the Act, 7 U.S.C. § 7. Defendants transferred, at minimum, USDC from pool participants to trading accounts at these digital asset exchanges. The accounts were not in the name of the Wolf Capital Pool, but were instead established in Ford's own name and/or using emails associated with Ford. Pool participant funds were commingled in the trading accounts. At these exchanges, Ford collectively traded pool participant funds in digital asset contracts, including bitcoin and ether, as well as futures on bitcoin and ether, all with pool participants' funds.

26.     Defendants told pool participants that their deposits of USDC to the Wolf Capital smart contract were "locked up" for sixty days. This meant that pool participants could not withdraw their deposits from the smart contract during the sixty-day lock up period. After the lock-up period, pool participants could withdraw their original deposit as well as their returns, or they could compound (that is, re-deposit) their returns in order to generate additional returns on the larger staked amount.

27.     Defendants communicated to Wolf Capital pool participants via the Wolf Capital website, as well as Telegram and Discord channels. Telegram and Discord are similar

applications that allow users to create and join groups, or communities.  Both allow administrators and users to communicate with each other via particular channels.

**B.  Defendants Defrauded Pool Participants by Misrepresenting Ford's Trading Experience and Performance, Providing False Account Statements That Concealed Defendants' Poor Trading Performance and the Financial Condition of the Pool, and Making Ponzi Payments to Pool Participants Who Sought to Withdraw Their Funds.**

**1.  Defendants Misrepresented to Pool Participants Ford's Trading Experience and Performance.**

28.     Defendants stated that in order to pay returns to pool participants, Ford would trade a portion of the funds in the smart contract to generate revenue.  To support these promised returns, Ford stated on February 11, 2023, that the most realistic daily return from just one type of trading bot was between one-and-a-half to two-and-a-half percent daily, which did not include revenue from the other bots or from manual trading.  On February 15, 2023, Ford said the trading would allow him "to trade and invest to generate revenue to be 100% non ponzi."  Throughout the Relevant Period, Defendants described their progress towards "clos[ing] the ponzi[] gap" on the platform.

29.     In marketing the Wolf Capital Pool, Defendants touted Ford's trading experience in oil during the Covid-19 pandemic, and claimed Ford made "a small fortune" doing so.  Defendants represented to pool participants and prospective pool participants that this trading experience also helped Ford profitably trade digital assets.  However, before launching Wolf Capital, Ford had little to no experience trading digital assets, no experience trading oil futures or other oil derivatives, and actually had lost money trading various oil company stocks.

30.     Defendants represented to pool participants that Ford was the only person who traded funds staked in the Wolf Capital smart contract.  Ford was the only person with visibility

into and control of funds in the digital asset exchange accounts that received funds transferred from the smart contract.

31.     To inspire confidence among pool participants, Defendants promised "100% transparency" in Ford's trading.  On February 15, 2023, Defendants represented on Wolf Capital's Telegram channel that they would disclose to pool participants all trades that Ford executed with funds deposited in the Wolf Capital smart contract, including the profit and loss resulting from each trade, with Ford stating, "everything we are doing is 100% transparency so you guys can see it all happening in real time."  Defendants represented to pool participants that they would display this transparency by posting trade alerts in real time on Wolf Capital's Telegram and Discord channels.

32.     Defendants' real-time trade alerts on Wolf Capital's Telegram and Discord channels were false and misrepresented to pool participants the profits and losses generated by Ford's trading of pool participant funds.  Although Defendants consistently and accurately posted Ford's profitable trades, they did not do so for trades resulting in a loss, thereby misrepresenting the Wolf Capital Pool's actual trading performance.  In addition, Defendants failed to include in the real-time trade alerts approximately $1 million in fees they incurred through Ford's trading, which falsely inflated the trading profits that they did post.  Defendants further posted "portfolio values" that did not accurately reflect the amount Defendants actually held in the trading accounts Ford used to trade pool participant funds.

33.     For example, from the time period between February 2, 2023, through July 13, 2023, Defendants shared seventy-two trade results from one exchange, sixty-two of which were profitable.  These trades shared by Defendants showed profits of $3,465,592 to the pool participants.  However, the exchange's records of Defendants' trading show that there were in

fact 422 trades during this time period, with a loss of $869,254, resulting in an overstatement of profits by Defendants of $4,334,846.

### 2. Defendants Issued False Account Statements.

34.     Defendants issued false account statements via a dashboard maintained on the Wolf Capital website located at:  https://wolfcapital.app/dapp.  On this dashboard, pool participants could log in and view the balance of their accounts, which included both the amount of BUSD and USDC that the pool participant deposited into the smart contract and the "yield" on those deposits.

35.     The pool participant account balances on the dashboard were not reflected in the smart contract and collectively represented a balance far in excess of the Wolf Capital Pool's actual balance because Defendants' trading was unprofitable.  Defendants did not generate revenue for the Wolf Capital Pool sufficient to pay the returns they promised to the pool participants and that they reflected in the pool participant account balances.

36.     Pool participants believed that the balances reflected on their account statements via the Wolf Capital dashboard reflected money that those pool participants could withdraw, but "returns" that were withdrawn by pool participants were in fact from deposits made by other pool participants, in the manner of a Ponzi scheme.

### 3. Defendants Unilaterally Reduce Promised Returns and Admit To Making Ponzi Payments.

37.     Defendants purported to make distributions of returns on a weekly basis.  At the end of each week, the Wolf Capital dashboard would reflect these returns to individual pool participants in the form of an increase in that pool participant's account balance.  Pool participants then had the option of either withdrawing the returns they received or compounding

these returns by adding them to the pool participant's balance, where it would purportedly generate additional returns.

38.     Although Defendants claimed to fund these weekly returns through trading profits, Defendants did not in fact generate sufficient trading profits to make the returns promised to each pool participant.  Consequently, Defendants began using pool participant deposits to the smart contract to fund returns to existing pool participants, in the manner of a Ponzi scheme.

39.     Eventually, Defendants could no longer sustain the returns they promised pool participants.  On April 21, 2023, Defendants reduced the maximum possible daily returns on USDC from two percent maximum down to 1.5 percent (547.5 percent annually).  In doing so, Ford promised pool participants that "[c]urrently we are sustaining 1.5%."  Less than two months later, on June 17, 2023, Defendants further reduced the maximum daily returns from 1.5 percent down to a maximum of 1.1 percent (401.5 percent annually).

40.     Less than three weeks later, on July 5, 2023, Defendants announced on Wolf Capital's Discord and Telegram channels that they were halting the operation of the Wolf Capital smart contract—pool participants could no longer deposit USDC into or withdraw USDC from the smart contract, and the smart contract would no longer make any payments on returns.  At the same time, Defendants announced that they were planning to launch a new Wolf Capital smart contract and that this new smart contract would issue returns based on revenue actually earned by Wolf Capital, which Defendants called "Variable Divs."  In connection with this announcement, Defendants promised that "we will never again pay out money we don't have," admitting that up to that point, they had not been making return payments from the trading profits generated from Ford's trading but instead with pool participant funds.

41.     After making these announcements and admissions, Defendants gave pool participants an opportunity to "unstake" if they did not want to participate in the new smart contracts.  However, Defendants stated that pool participants who chose to unstake had to accept a loss.  Many pool participants chose to unstake and accept a loss; however, they did not receive any return of their staked amounts.

42.     On July 8, 2023, Defendants admitted via Wolf Capital's Telegram channel that they had paid $2.4 million to pool participants that did not come from trading profits generated by trading assets staked by pool participants.  In other words, Defendants made at least $2.4 million in payments that came from the principal deposits of other pool participants, in the manner of a Ponzi scheme.

43.     During the Relevant Period, Ford was a controlling person of Wolf Capital.  Ford was the sole owner of Wolf Capital and was the sole trader for the Wolf Capital Pool.  In addition, Ford directed what amount of BUSD and USDC staked in the Wolf Capital smart contract should be sent to digital asset exchanges, and to which digital asset exchanges those deposits should be made.  Ford created false weekly portfolio and trading profits summaries, and posted only selected profitable trades executed with pool funds, on the Telegram and Discord channels, omitting unprofitable trades.  These fraudulent weekly trading summaries and selective trade posts created the impression that Defendants were trading profitably on behalf of the Wolf Capital Pool, when in fact the weekly summaries and selected trades posted did not accurately represent Ford's unprofitable trading or the value of the Wolf Capital portfolio.  Ford therefore did not act in good faith and/or knowingly induced Wolf Capital's fraudulent acts.

44.     Ford's acts, omissions, and failures occurred with the scope of his employment or office with Wolf Capital.  Wolf Capital is vicariously liable for Ford's violations of the Act and

Regulations because Ford acted as Wolf Capital's agent when he made material misrepresentations and omissions on Wolf Capital's behalf, and when he misappropriated Wolf Capital funds from its pool participants.

**C.    Wolf Capital Collapses.**

45.    Despite the picture of financial health previously presented via live trade and portfolio balance postings on Telegram and Discord, Ford's trading in fact resulted in huge losses to Wolf Capital's portfolio, and as of approximately August 10, 2023, a Wolf Capital administrator reported via Telegram that the Wolf Capital Pool had current assets of only around $3,000.

46.    Defendants admitted to hiding the trading losses from and lying to pool participants, using Photoshop to create trade and portfolio screenshots that purported to show profitable trades and an increasing portfolio value.

47.    After these admissions, Defendants continued to assure Wolf Capital pool participants that they had plans in place to return initial deposits.  Ultimately, however, Defendants never returned even the initial deposit amount to those pool participants, let alone the promised returns.

**D.    Ford Pleads Guilty to Conspiracy To Commit Wire Fraud in Connection With the Conduct Charged in This Complaint.**

48.    On December 4, 2024, Ford signed a plea agreement admitting to conspiracy to commit wire fraud relating to the conduct described herein.  The Department of Justice filed an information against Ford on December 10, 2024, *United States v. Ford*, No. 4:24-cr-00387-JDR

(N.D. Okla. Dec. 10, 2024) (Dkt. 1) (the "Criminal Matter"), and on January 9, 2025, the court

entered Ford's guilty plea. *Id.*, Dkts. 20 (Plea Agreement), 22 (Order).

49.    In his guilty plea, Ford admitted that he engaged in a scheme to defraud investors

in Wolf Capital, including promising returns between one to two percent daily, although he "did

not believe those investment returns were possible to achieve consistently."  Ford also admitted

that he posted to the Wolf Capital Telegram channel that the investment was safe, although he

knew that Defendants lost and misappropriated investor funds prior to this false statement, and

that he made this and other false statements with the intent to induce individuals to invest money

with Wolf Capital, and to remain invested in Wolf Capital.  Finally, Ford admitted that he posted

on the Telegram and Discord channels false trading profit and loss summaries that did not reflect

the trading profits and losses actually incurred by Defendants' trading with investor funds, also

with the intent to induce individuals to invest their money or remain invested with Defendants.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation
180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2025)**

**(Fraud by Deceptive Device or Contrivance)**

50.    Paragraphs 1 through 49 are realleged and incorporated herein by reference.

51.    7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

[U]se or employ, or attempt to use or employ, in connection with any
swap, or a contract of sale of any commodity in interstate commerce, or
for future delivery on or subject to the rules of any registered entity, any
manipulative or deceptive device or contrivance, in contravention of such
rules and regulations as the Commission shall promulgate . . . .

52.    17 C.F.R. § 180.1(a) (2025), provides:

It shall be unlawful for any person, directly or indirectly, in connection
with any swap, or contract of sale of any commodity in interstate

commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

53.     The digital assets at issue in this complaint, including bitcoin and ether, are commodities in interstate commerce pursuant to Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

54.     During the Relevant Period, in connection with a contract of sale of any commodity in interstate commerce (i.e., spot contracts on digital asset commodities), Defendants intentionally or recklessly:  (i) used or employed, or attempted to use or employ, manipulative or deceptive devices or contrivances; (ii) made or attempted to make untrue or misleading statements of material fact or omitted to state a material fact; and/or (iii) engaged or attempted to engage in an act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a), by making material misrepresentations, omitting and failing to disclose material facts, and engaging in acts of misappropriation, including but not limited to:

(a)     falsely representing Ford's trading expertise and past trading success;

(b)     falsely promising pool participants they could earn on deposited funds up to three-and-a-half percent daily returns or, in other instances, up to two percent daily returns, knowing that they could not generate returns sufficient to pay pool participants these daily returns;

(c)     falsely representing Wolf Capital's trading results and concealing losing trades from pool participants;

(d)     posting false portfolio values to Wolf Capital's Discord and Telegram channels knowing it would boost confidence in the smart contract;

(e)     posting on the Wolf Capital dashboard account values that reflected one to two percent "yield" on pool participants' deposits, when in fact Wolf Capital did not generate revenue sufficient to pay pool participants these returns; and

(f)     misappropriating pool participant funds by paying returns to pool participants using the deposits of other pool participants in the manner of a Ponzi scheme.

55.     The foregoing acts, omissions, and failures occurred within the scope of Ford's employment or office with Wolf Capital.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2025), Wolf Capital is liable for Ford's material misrepresentations, material omissions, or acts of misappropriation in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

56.     Ford controlled Wolf Capital, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Wolf Capital's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ford is liable for Wolf Capital's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

57.     Each and every scheme or artifice to defraud; each misrepresentation and omission; and each act, practice or course of business which operated as a fraud and deceit upon pool participants; including but not limited to those specifically alleged herein, was made with the knowledge that, or made with reckless disregard of the fact that, it was false or misleading.

58.     Each material misrepresentation, material omission, or act of misappropriation made by Defendants, including but not limited to those specifically alleged herein, is a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

17

## COUNT II

### Violations of Section 4b(a)(2)(A)-(C), 7 U.S.C. § 6b(a)(2)(A)-(C)

### (Fraud in Connection with Digital Asset Futures Contracts)

59. Paragraphs 1 through 49 are realleged and incorporated herein by reference.

60. 7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

(2)    [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with any other person, other than on or subject to the rules of a designated contract market

(A)    to cheat or defraud or attempt to cheat or defraud the other person;

(B)    willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C)    willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

61. In connection with orders to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with any other person, other than on or subject to the rules of a designated contract market, Defendants violated 7 U.S.C. § 6b(a)(2)(A)-(C) by willfully, among other things:

(a)    falsely representing Ford's trading expertise and past trading success;

(b)    falsely promising pool participants they could earn on deposited funds up to three-and-a-half percent daily returns or, in other instances, up to two percent daily returns, knowing that they could not generate returns sufficient to pay pool participants these daily returns;

(c)    falsely representing Wolf Capital's trading results and concealing losing trades from pool participants;

(d)     posting false portfolio values to Wolf Capital's Discord and Telegram channels knowing it would boost confidence in the smart contract;

(e)     posting on the Wolf Capital dashboard account values that reflected one to two percent "yield" on pool participants' deposits, when in fact Wolf Capital did not generate revenue sufficient to pay pool participants these returns; and

(f)     misappropriating pool participant funds by paying returns to pool participants using the deposits of other pool participants in the manner of a Ponzi scheme.

62.     The foregoing acts, omissions, and failures occurred within the scope of Ford's employment or office with Wolf Capital.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2025), Wolf Capital is liable for Ford's material misrepresentations, material omissions, or acts of misappropriation in violation of 7 U.S.C. § 6b(a)(2)(A)-(C).

63.     Ford controlled Wolf Capital, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Wolf Capital's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ford is liable for Wolf Capital's violations of 7 U.S.C. § 6b(a)(2)(A)-(C).

64.     Each and every material misrepresentation and omission by Defendants, including but not limited to those specifically alleged herein, was made with the knowledge that, or made with reckless disregard of the fact that, it was false or misleading.

65.     Each material misrepresentation, material omission, or act of misappropriation made by Defendants, including but not limited to those specifically alleged herein, is a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C).

## COUNT III

**Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)**

**(Fraud and Deceit by a Commodity Pool Operator
and an Associated Person of a Commodity Pool Operator)**

66.     Paragraphs 1 through 49 are realleged and incorporated herein by reference.

67.     Section 1a(10)(A) of the Act, 7 U.S.C. § 1a(10)(A), defines a commodity pool, in

relevant part, as:

> any investment trust, syndicate, or similar form of enterprise operated for
> the purpose of trading in commodity interests, including any –
>
> (I)     commodity for future delivery, security futures product, or swap . .
> . .

68.     Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a commodity

pool operator, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool,
> investment trust, syndicate, or similar form of enterprise, and who, in
> connection therewith, solicits, accepts, or receives from others, funds,
> securities, or property, either directly or through capital contributions, the
> sale of stock or other forms of securities, or otherwise, for the purpose of
> trading in commodity interests, including any—
>
> (I)     Commodity for future delivery, security futures product, or
> swap . . . .

69.     During the Relevant Period, Wolf Capital engaged in a business, for compensation

or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of

enterprise, and in connection therewith, solicited, accepted, or received from others, funds,

securities, or property, either directly or through capital contributions, the sale of stock or other

forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore,

Wolf Capital acted as an unregistered commodity pool operator ("CPO"), as defined by 7 U.S.C.

§ 1a(11), of the Wolf Capital Pool.

70.    Regulation 1.3, 17 C.F.R. § 1.3 (2025), defines an Associated Person ("AP") of a CPO as any natural person associated with a CPO

> as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

71.    During the Relevant Period, Ford was associated with a CPO as a partner, officer, employee or consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or the supervision of any person or persons so engaged.  Therefore, Ford was an AP of a CPO as defined by 17 C.F.R. § 1.3 (2025).

72.    7 U.S.C. § 6*o*(1) prohibits CPOs, whether registered with the CFTC or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

73.    During the Relevant Period, Wolf Capital, while acting as a CPO, and Ford, while acting as an AP of a CPO, through use of the mails or any means or instrumentality of interstate commerce, violated 7 U.S.C. § 6*o*(1)(A) and (B) by making material misrepresentations, omitting and failing to disclose the material facts, and engaging in the acts of misappropriation, including but not limited to:

(a)    falsely representing Ford's trading expertise and past trading success;

(b)    falsely promising pool participants they could earn on deposited funds up to three-and-a-half percent daily returns or, in other instances, up to two percent daily returns, knowing that they could not generate returns sufficient to pay pool participants these daily returns;

(c)    falsely representing Wolf Capital's trading results and concealing losing trades from pool participants;

(d)    posting false portfolio values to Wolf Capital's Discord and Telegram channels knowing it would boost confidence in the smart contract;

(e)    posting on the Wolf Capital dashboard account values that reflected one to two percent return on pool participants' deposits, when in fact Wolf Capital did not generate revenue sufficient to pay pool participants these returns; and

(f)    misappropriating pool participant funds by paying returns to pool participants using the deposits of other pool participants in the manner of a Ponzi scheme.

74.    The foregoing acts, omissions, and failures occurred within the scope of Ford's employment or office with Wolf Capital.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2025), Wolf Capital is liable for Ford's material misrepresentations, material omissions, or acts of misappropriation in violation of 7 U.S.C. § 6*o*(1)(A)-(B).

75.    Ford controlled Wolf Capital, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Wolf Capital's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ford is liable for Wolf Capital's violations of 7 U.S.C. 6*o*(1)(A)-(B).

76.    Each and every material misrepresentation and omission by Defendants, including but not limited to those specifically alleged herein, was made with the knowledge that, or with reckless disregard of the fact that, it was false or misleading.

77.    Each material misrepresentation, material omission, act of misappropriation, or false advertisement made by Defendants, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

## COUNT IV

**Violation of Sections 4k(2) and 4m(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1)**

**(Failure to Register as a CPO and an AP of a CPO)**

78.     Paragraphs 1 through 49 are realleged and incorporated herein by reference.

79.     Section 1a(10)(A) of the Act, 7 U.S.C. § 1a(10)(A), defines a commodity pool, in relevant part, as:

> any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any –
>
> (II)     commodity for future delivery, security futures product, or swap . . . .

80.     Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a commodity pool operator, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
>
> (II)     Commodity for future delivery, security futures product, or swap . . . .

81.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

82.     Regulation 1.3, 17 C.F.R. § 1.3 (2025), defines an Associated Person ("AP") of a CPO as any natural person associated with a CPO

> as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property

for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

83.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall

be:

[U]nlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

84.    By reason of the foregoing, during the Relevant Period, Wolf Capital engaged in a

business, for compensation or profit, that is of the nature of a commodity pool, investment trust,

syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or

received from others, funds, securities, or property, either directly or through capital

contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of

trading in commodity interests; therefore, Wolf Capital acted as a CPO, as defined by 7 U.S.C.

§ 1a(11).

85.    Wolf Capital, while using the mails or means of interstate commerce in

connection with its business as a CPO, has never been registered with the Commission as a CPO.

86.    By reason of the foregoing, Wolf Capital acted as an unregistered CPO in

violation of 7 U.S.C. § 6m(1).

87.    By reason of the foregoing, during the Relevant Period, Ford associated with a

CPO (as defined by 7 U.S.C. § 1a(11)) as a partner, officer, employee, consultant, or agent (or

any natural person occupying a similar status or performing similar functions), in a capacity that

involved the solicitation of funds, securities, or property for participation in a commodity pool or

the supervision of persons so engaged; therefore, Ford acted as an AP of a CPO as defined by 17 C.F.R. § 1.3.

88.    Ford has never been registered with the Commission as an AP of a CPO.

89.    By reason of the foregoing, Ford acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).

90.    The foregoing acts, omissions, and failures occurred within the scope of Ford's employment or office with Wolf Capital.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2025), Wolf Capital is liable as a principal for each act, omission, or failure of Ford constituting a violation of 7 U.S.C. § 6k(2).

91.    Ford controlled Wolf Capital, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Wolf Capital's violations of 7 U.S.C. § 6m(1). Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ford is liable for Wolf Capital's violations of 7 U.S.C. § 6m(1).

92.    Each instance that Wolf Capital acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

93.    Each instance that Ford acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

## VI.    RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find that Defendants violated Sections 4b(a)(2)(A)-(C), 4k(2), 4m(1), 4o(1)(A)-(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B), 9(1); and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2025);

B.      Enter an order of permanent injunction enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6*o*(1)(A)-(B), 9(1), and 17 C.F.R. § 180.1(a)(1)-(3);

C.      Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

(1)     Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

(2)     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025)) or digital asset commodities for accounts held in the name of Defendants or for accounts in which Defendants have a direct or indirect interest;

(3)     Having any commodity interest or digital asset commodity traded on Defendants' behalf;

(4)     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities;

(5)     Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests or digital asset commodities;

26

(6)    Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025); and

(7)    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2025)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D.    Enter an order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including but not limited to salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.    Enter an order directing Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.    Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2025), or subsequent annually adjusted amounts, for each violation of the Act and Regulations, as described herein;

G.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

H.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: December 19, 2025           Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

*/s/ Anthony C. Biagioli*
Thomas L. Simek (Attorney-In-Charge)
NY Bar No. 4166161
tsimek@cftc.gov
Anthony C. Biagioli
MO Bar No. 72434
abiagioli@cftc.gov
2600 Grand Boulevard, Suite 210
Kansas City, MO 64108
(816) 960-7700 (telephone)
(816) 960-7750 (facsimile)